# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP226-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>　　　　Plaintiff-Respondent-Petitioner,<br>　　v.<br>Jeffrey L. Hineman,<br>　　　　Defendant-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 400 Wis. 2d 274,968 N.W.2d 867
(2021 – unpublished)

| | |
|---|---|
| OPINION FILED:<br>SUBMITTED ON BRIEFS: | January 10, 2023 |
| ORAL ARGUMENT: | November 8, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| 　COURT: | Circuit |
| 　COUNTY: | Racine |
| 　JUDGE: | Mark F. Nielsen |

JUSTICES:
ZIEGLER, C.J., delivered the majority opinion for a unanimous Court. KAROFSKY, J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *Sarah L. Burgundy*, assistant attorney general, with whom on the briefs was *Joshua L. Kaul*, attorney general. There was an oral argument by *Sarah L. Burgundy*, assistant attorney general.

For the defendant-appellant, there was a brief filed by *Frances Reynolds Colbert*, assistant state public defender. There was an oral argument by *Frances Reynolds Colbert*, assistant state public defender.

An amicus curiae brief was filed by *Robert R. Henak, Ellen Henak,* and *Henak Law Office, S.C.,* for the Wisconsin Association of Criminal Defense Lawyers.

**2023 WI 1**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP226-CR
(L.C. No. 2015CF1159)

STATE OF WISCONSIN    :    IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent-Petitioner,**

  **v.**

**Jeffrey L. Hineman,**

      **Defendant-Appellant.**

**FILED**

**JAN 10, 2023**

Sheila T. Reiff
Clerk of Supreme Court

ZIEGLER, C.J., delivered the majority opinion for a unanimous Court. KAROFSKY, J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined.

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 ANNETTE KINGSLAND ZIEGLER, C.J. This is a review of an unpublished decision of the court of appeals, State v. Hineman, No. 2020AP226-CR, unpublished slip op. (Wis. Ct. App. Nov. 24, 2021) (per curiam), reversing the Racine County circuit court's[1] judgment of conviction against Jeffrey Hineman for first-degree child sexual assault, S.J.S., and order denying Hineman's motion for postconviction relief. We reverse.

¶2 Hineman argues that he is entitled to a new trial because the State suppressed evidence favorable to his defense

---

[1] The Honorable Mark F. Nielsen presided.

in violation of his due process rights under Brady v. Maryland, 373 U.S. 83 (1963). According to Hineman, the State failed to disclose a report from Child Protective Services ("CPS") which contained "material exculpatory impeachment evidence that went to an issue at the heart of the case." He argues the circuit court erred in denying his motion for postconviction relief and that the court of appeals was correct to reverse that decision. Hineman also argues two alternative grounds for affirming the court of appeals: "he was denied effective assistance of counsel," and he "is entitled to a new trial[] and an in camera review of [S.J.S.'s] treatment records[] in the interests of justice."

¶3 We conclude that Hineman is not entitled to postconviction relief. The State did not violate Hineman's due process rights by failing to disclose the CPS report because the report was not material. There is no reasonable probability of a different result if the State had disclosed the CPS report because Hineman had access to a police report containing the same information. Hineman's four ineffective assistance of counsel claims also fail. He was not prejudiced by trial counsel's failure to request the subject report, and the other claims fail because counsel's performance was not deficient. Finally, we decline to exercise our discretion to grant Hineman a new trial in the interest of justice because there were no errors at trial that prevented the real controversy from being tried. The circuit court was correct to deny Hineman's motion

for postconviction relief. We therefore reverse the court of appeals.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶4 Hineman was in a romantic relationship with S.J.S.'s mother, S.S., since shortly before S.J.S. was born in 2008 and until June 2009. Though Hineman is not S.J.S.'s biological father, he continued to remain in contact with S.J.S. until S.S. and S.J.S. moved away in September 2009. S.S. eventually lost custody of S.J.S., and S.J.S. moved in with his biological father, F.S. In 2013, Hineman contacted M.S., S.J.S.'s grandmother and F.S.'s mother, requesting to reestablish contact with S.J.S. because Hineman "cared for [S.J.S.] and wanted to be a part of [his] life and family." M.S. and F.S. both agreed, after which Hineman had regular contact with S.J.S. Hineman would spend time with S.J.S. at F.S.'s home, buy gifts for S.J.S, and take him out for activities such as shopping or going to the park.

¶5 On March 12, 2015, CPS received a mandatory report from a therapist S.J.S. was seeing at the time.[2] According to the report, S.J.S. had been seeing the therapist to address behavioral issues such as "pulling his pants down in class and also at home in his room and acting as if he is going to defecate on the floor." The therapist reported that "during school . . . [S.J.S.] was observed sucking on his pen cap" and

---

[2] See Wis. Stat. § 48.981 (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

that S.J.S. "told a classmate [it] 'feels good when someone sucks on your privates.'" S.J.S. initially told the therapist that he learned this from a Garfield book or movie but later "indicated that [Hineman] had told him." The CPS report also states, "Reporter indicated that no information was given by [S.J.S.] that [Hineman] had touched him or forced [S.J.S.] to touch [Hineman]." The therapist reported that she told F.S. and M.S. about her concerns, and that they were no longer permitting Hineman to have contact with S.J.S.

¶6 CPS received a second report on April 20, 2015, from a nurse at Aurora Healthcare. The nurse reported that S.J.S.'s behavioral issues persisted. She spoke with F.S. and M.S. and reported they "feel that someone must be abusing [S.J.S.] since his behavior is getting worse." The nurse also reported that F.S. and M.S. believed either Hineman or "an autistic son, whose name is not known," abused S.J.S.

¶7 CPS received a third report on May 29, 2015, from both a teacher and a counselor at S.J.S.'s school. The CPS report states, "Both reporters feel the concerns today for [S.J.S.] are his continuation of defiant behaviors at school resulting from what is believed to be sexual[] abuse by a former family friend." The teacher and counselor reported their concerns are based on observations of S.J.S.'s behavior at school as well as conversations with S.J.S.'s family.

¶8 On June 5, 2015, the Racine County Sheriff's Office received a copy of the March 12 CPS report. It is undisputed

6

that the sheriff's office never received either the April 20 or May 29 CPS reports.

¶9 Investigator Tracy Hintz was assigned to the case and began her investigation by reviewing the March 12 CPS report. She summarized the CPS report's contents in a police report:

> The report indicates that [S.J.S.] was sucking on a pen at school and told a classmate that it feels good to have your privates sucked on. He said he learned it in a Garfield book but then stated it was from the Garfield 2 movie. The reporter spoke to [F.S.] about it and [S.J.S.] indicated that [Hineman] had told him. No specific information was given on if [Hineman] touched [S.J.S.] or forced [S.J.S.] to touch [Hineman].

Investigator Hintz interviewed F.S. and M.S. She also coordinated a forensic interview of S.J.S., which took place at the Child Advocacy Center ("CAC") on August 4, 2015. During the forensic interview, S.J.S. disclosed that Hineman had touched him inappropriately. Investigator Hintz interviewed Hineman the next day.

¶10 On August 6, 2015, based on this investigation, the State filed a criminal complaint charging Hineman with first-degree child sexual assault, sexual contact with a person under the age 13, contrary to Wis. Stat. § 948.02(1)(e).

¶11 Hineman filed a pretrial discovery demand for the State to disclose "[a]ll evidence and/or other information which would tend to negate the guilt of the defendant, including laboratory reports, hospital records or reports, police reports, or any other information within the state's possession, knowledge, or control." The State did not provide the March 12

7

CPS report, but it did provide Investigator Hintz's police report summarizing the CPS report.

¶12 At trial, defense counsel waived opening statement. The State called four witnesses: the forensic interviewer from the CAC, S.J.S., M.S., and Investigator Hintz. The forensic interviewer, Heather Jensen, testified that she interviewed S.J.S. and described how a forensic interview is conducted. She also described the concepts of "piecemeal disclosure" and "delayed disclosure":

> Piecemeal disclosure is where kids tell bits and pieces of their disclosure at a time. So it's typical for kids to tell a little bit over extended periods of time so they might tell the initial reporter just one detail. Then they might tell more later on to different people. So some time kids will disclose a little bit to just gauge you as an adult, the reaction to see how the adult will react. . . .

> [D]elayed disclosure is when a victim reports abuse after it['']s happened. Research shows that typically about a third of kids delay disclosing what happened. About a third of kids will tell what happened right after it happened. About a third of kids do not disclose at all. So it's common that kids delay in their reporting. There is different reasons for it. Some is that kids are fearful. Some kids have been told that they could be hurt if they disclose so they don't disclose initially. Some kids have been hurt by the maltreater. They are afraid of the maltreater. They don't disclose immediately or if they don't have trusted adults to disclose to.

> There is lots of different reasons that kids don't talk right away. A difficult thing for kids to talk about something that's shameful or embarrassing. Or even young kids some times don't know at the time that it's happening; that it's wrong. So they some times don't disclose until they realize that that's what happened to them is not right.

8

The State did not notice Jensen as an expert witness. Defense counsel did not object to this testimony, but she did challenge its relevance on cross-examination: "Ms. Jensen, this is not a case of delayed disclosure, correct?"

¶13 After Jensen's testimony, the State next played the video recording of S.J.S.'s forensic interview. It included the following exchanges:

[Interviewer]: Did [Hineman] ever do anything else that you didn't like? Tell me about that.

[S.J.S.]: He touched my private parts.

[Interviewer]: Okay. Tell me all about [Hineman] touching your private parts.

[S.J.S.]: Ugh, my mom and dad were sleeping, and me and him were on the couch and he just touched my private parts.

[Interviewer]: Uh-hmm. And then what happened?

[S.J.S.]: He laughed at me.

[Interviewer]: He laughed at you? Okay. Then what happened?

[S.J.S]: I woke my mom and dad up and I told them.

[Interviewer]: Okay. And then what happened?

[S.J.S.]: Um, he kicked [Hineman] out again, and he told him that -- to never come back.

. . . .

[Interviewer]: Okay. And did [Hineman] touch on your clothes or your skin?

[S.J.S.]: My clothes.

. . . .

9

> [Interviewer]: . . . Did [Hineman] ever want you to do something to his privates?
>
> [S.J.S.]:  Yeah, but I didn't do it.
>
> [Interviewer]:  What did [Hineman] want you to do?
>
> [S.J.S.]:  Touch his privates, but I didn't do it.

S.J.S. said in the interview that this incident occurred during the "wintertime."  He first told the interviewer that Hineman touched him four times but later said it was six.

¶14  After the State played the video, S.J.S. testified. S.J.S. initially responded "No" or "I can't remember" to most of the State's questions regarding whether Hineman had touched him, but S.J.S. became more responsive after saying that he felt nervous.  S.J.S. testified, "I think [Hineman] touched me on my private part."  He said this happened "the day right after trick-or-treating," nobody else was in the house at the time, and he told M.S. and F.S. about it the same day.  On cross-examination, S.J.S. said he told M.S. and F.S. "[a] few weeks after it happened" and at different times.  M.S. later testified that no such disclosure took place: "[S.J.S.] claims that he told his daddy but he didn't come right out and say what anything was.  He just didn't want to be around [Hineman] any more. . . . I knew something was wrong.  I kept saying [S.J.S.] what's wrong.  Tell grandma.  He kept saying nothing."

¶15  The State's final witness was Investigator Hintz.  She testified that Hineman's behavior toward S.J.S. "in the totality of everything that he was doing is often described as what we

10

would refer to as grooming." Defense counsel objected to this statement as unnoticed expert testimony, and the court sustained that objection.

¶16 On cross-examination, defense counsel questioned Investigator Hintz regarding when S.J.S. first disclosed that Hineman had touched him:

> [Defense Counsel:] You first met with [F.S.] and [M.S.] in July of 2015?
>
> [Hintz:] Correct.
>
> . . . .
>
> [Defense Counsel:] . . . There was no mention that [Hineman] had inappropriately touched [S.J.S.]?
>
> [Hintz:] From [F.S.] no. There was not.
>
> [Defense Counsel:] And there is no mention from [M.S.] that there was a[n] allegation that [Hineman] had touched [S.J.S.]?
>
> [Hintz:] No.
>
> [Defense Counsel:] So the forensic interview of [S.J.S.] in August of 2015?
>
> [Hintz:] In the beginning, correct.
>
> [Defense Counsel:] And you were present for that?
>
> [Hintz:] I was.
>
> [Defense Counsel:] And is that the first time that [S.J.S.] says that [Hineman] touched his privates?
>
> [Hintz:] I don't know if that's the first time [S.J.S.] had said that. I know that was the first time that I had seen that. But I believe in the CPS report, that there was a statement in there that he

11

said [Hineman] had done that. But I would have to look at the original report that came from CPS.

[Defense Counsel:] Would that have been anywhere in your report if you -- if there was a mention that [Hineman] had inappropriately touched [S.J.S.]?

[Hintz:] I don't know if I documented that. Whether or not I would have to look at my report again, in my original narrative to see if I did indeed write that in there.

[Defense Counsel:] But if you were told that, you would have then put it in your report?

[Hintz:] I would think I would have but it's not -- I might have not put it in there but that's why I would have to look at the report and look at the original CPS. I believe it does state that he later says that.

¶17 The defense called no witnesses except for Hineman. Hineman described his relationship with S.J.S. and his family, how his communication with them changed after March 2015, and he denied sexually assaulting S.J.S.

¶18 The jury found Hineman guilty of first-degree child sexual assault, sexual contact with a person under the age 13. The court sentenced Hineman to 17 years of initial confinement and 8 years of extended supervision.

¶19 On March 1, 2019, Hineman filed a motion requesting postconviction relief and an order compelling postconviction discovery of the March 12 CPS report. He claimed the State suppressed material evidence favorable to his defense in violation of his due process rights under Brady. Hineman also claimed he received ineffective assistance of counsel because of his attorney's "failing to obtain the CPS report before trial,"

12

"failing to make an opening statement," "failing to object to improper expert testimony," and "conceding Mr. Hineman's guilt at closing."[3] Hineman further requested a new trial in the interest of justice and in camera review of S.J.S.'s treatment records.

¶20 The circuit court granted Hineman's motion for postconviction discovery and recommended the release of all three CPS reports.[4] After briefing and oral argument, the court issued a decision denying each of Hineman's claims for postconviction relief. The court first held that the March 12 CPS report was not material under Brady because "[t]he information in Investigator Hintz's report corresponded to the information in the March [12] report."

¶21 The circuit court also rejected each of Hineman's ineffective assistance claims. The court did not address trial counsel's failure to obtain the CPS reports because the March 12 report was "the only report of consequence." It held that trial counsel's decision to waive opening statement was not deficient

---

[3] Hineman also claimed he received ineffective assistance of counsel because of his attorney's "failing to obtain a defense expert," "failing to file a Shiffra/Green motion," and "failing to move for a mistrial." See State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993); State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298. The circuit court rejected each of these claims, and Hineman did not raise them either before the court of appeals or this court.

[4] The circuit court recommended to the juvenile court that it release the CPS reports. The Honorable David W. Paulson of the juvenile court ordered the release.

13

performance based on counsel's explanation at the <u>Machner</u>[5] hearing: "I had some concerns about what [Hineman] would say when he took the stand. I didn't want to make an opening statement and commit him to something that he wouldn't then say in his direct." The circuit court also credited trial counsel's explanation for not objecting to Jensen's unnoticed expert testimony. Counsel explained, "I just thought that I would on my cross cover [the delayed disclosure testimony] because I didn't think that this was a case of delayed disclosure, if I remember correctly." The circuit court rejected Hineman's last claim of ineffective assistance——that trial counsel conceded guilt in closing argument by stating, "but I believe the sexual assault happened." The court found the statement was not a concession of guilt because "[c]learly defense counsel was speaking ironically. . . . Counsel's point was to criticize the version of events that had been testified to."

¶22 Finally, the circuit court denied Hineman's request for an in camera review of S.J.S.'s treatment records. The court concluded Hineman did not satisfy the standard under <u>State v. Green</u>, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298, because "no one has shown in this record a 'fact specific evidentiary showing' that the records of [S.J.S.'s] therapy support any defense to this charge."

---

[5] <u>State v. Machner</u>, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶23 Hineman appealed the circuit court's order, and the court of appeals reversed. The court of appeals concluded that suppression of the March 12 CPS report violated Hineman's due process rights under Brady. The court reasoned that the report was material under Brady because Investigator Hintz "could not be impeached . . . without the report itself, and thus, the undermining of the investigator's recall of events related to the investigation and her credibility more generally could not occur without the report itself." Hineman, No. 2020AP226-CR, ¶47. The court of appeals also concluded Hineman was entitled to an in camera review of S.J.S.'s therapy records based on the information the therapist reported to CPS. Id., ¶52.

¶24 The State petitioned this court for review, which we granted.

## II. STANDARD OF REVIEW

¶25 When assessing a Brady claim, "we independently review whether a due process violation has occurred, but we accept the trial court's findings of historical fact unless clearly erroneous." State v. Wayerski, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468. We apply this same standard of review to claims of ineffective assistance of counsel under the Sixth Amendment. State v. Dillard, 2014 WI 123, ¶86, 358 Wis. 2d 543, 859 N.W.2d 44 ("An appellate court upholds the circuit court's findings of fact unless they are clearly erroneous . . . [and] independently determines whether those historical facts demonstrate that defense counsel's performance

15

met the constitutional standard for ineffective assistance of counsel . . . .").

¶26 Regarding Hineman's request for an in camera review of therapy records, we review such claims de novo. Green, 253 Wis. 2d 356, ¶20. Finally, because neither the circuit court nor the court of appeals addressed whether to grant a new trial in the interest of justice, we consider this issue de novo. See Bosco v. LIRC, 2004 WI 77, ¶22, 272 Wis. 2d 586, 681 N.W.2d 157 (analyzing de novo an issue raised below but not addressed).

### III. ANALYSIS

¶27 We begin our review by addressing Hineman's Brady claim and concluding that the State did not commit a Brady violation because the subject evidence was not material. We then turn to each of Hineman's claims that he received ineffective assistance of counsel. In analyzing those claims, we determine Hineman was not prejudiced by trial counsel's failure to request the March 12 CPS report and that the remaining ineffective assistance claims fail for lack of deficient performance. Finally, we deny Hineman's request to order a new trial in the interest of justice.

### A. Brady Claim

¶28 The United States Supreme Court in Brady, 373 U.S. 83, imposed on prosecutors a duty under the Due Process Clause of the Fourteenth Amendment to disclose evidence favorable to the defense. Brady involved a defendant on trial for murder who testified he was involved in the murder but that his co-actor directly committed it. Id. at 84. The jury found the defendant

16

guilty and sentenced him to death. Id. After the defendant was convicted and sentenced, he learned the prosecution failed to comply with a pretrial discovery request by withholding a statement by the defendant's co-actor admitting to the murder. Id. The Court held that such "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87.

¶29 The Supreme Court has since explained, "[t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). The parties do not dispute that the March 12 CPS report is favorable to Hineman's defense and that the State suppressed the report. We therefore assume without deciding that the first two requirements of Hineman's Brady claim are satisfied. The parties do however disagree as to whether Hineman was prejudiced by the State's suppressing the report——that is, whether the report is "'material' either to guilt or to punishment." Wayerski, 385 Wis. 2d 344, ¶35.

¶30 "While previously the standard for materiality varied depending upon the type of Brady violation, the Supreme Court has since adopted a uniform standard for materiality . . . ." State v. Harris, 2004 WI 64, ¶14, 272 Wis. 2d 80, 680 N.W.2d 737

17

(citation omitted). The Court explained that standard in <u>United States v. Bagley</u>: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." 473 U.S. 667, 682 (1985). In conducting this analysis,[6]

> [t]he reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete [discovery] response.

<u>Id.</u> at 683.

¶31 Hineman argues the March 12 CPS report "was material exculpatory impeachment evidence that went to an issue at the heart of the case——when and how [S.J.S.] disclosed that Mr. Hineman had sexually assaulted him, and what the circumstances of the disclosure indicated about its reliability." "Generally, where impeachment evidence is merely cumulative and thereby has no reasonable probability of affecting the result of trial, it does not violate the <u>Brady</u>

---

[6] The State criticizes the court of appeals' analysis for "reweighing the witnesses' credibility based on a paper record, displacing the role of the factfinder." The State asks us to clarify that, "on review, deference to the factfinder's unique function is warranted in determining whether but for the complained-of errors, there is a substantial likelihood of a different result." We see no need to rework the formulation for assessing <u>Brady</u> materiality that the Supreme Court announced in <u>Bagley</u>.

requirement." United States v. Dweck, 913 F.2d 365, 371 (7th Cir. 1990). Impeachment evidence is cumulative and therefore not material when "the witness was already [or could have been] impeached at trial by the same kind of evidence."[7] Conley v. United States, 415 F.3d 183, 192 (1st Cir. 2005) (alteration in original) (emphasis omitted) (quoting United States v. Cuffie, 80 F.3d 514, 518 (D.C. Cir. 1996)); see also Ferrara v. United States, 456 F.3d 278, 294 (1st Cir. 2006) (considering "whether the sequestered evidence was cumulative of other evidence already in the defendant's possession"); United States v. Marashi, 913 F.2d 724, 733 (9th Cir. 1990) (holding officer's police report contradicting officer's testimony was cumulative where officer also made a similar inconsistent statement in a deposition).

¶32 According to Hineman, the March 12 CPS report was not merely cumulative in two respects: "the CPS report is the only document that contains the clear exculpatory statement that as of March 12, [S.J.S.] had not made any disclosures of maltreatment," and "even more important, the CPS report

---

[7] Impeachment evidence may also be cumulative, and therefore not material, "when the testimony of the witness is 'corroborated by other testimony,' or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995)(citation omitted) (quoting United States v. Petrillo, 821 F.2d 85, 89 (2d Cir. 1987)); see also State v. Rockette, 2006 WI App 103, ¶41, 294 Wis. 2d 611, 718 N.W.2d 269.

19

clarifies who the mandatory reporter was: [S.J.S.'s] therapist." We disagree on both counts.

¶33 The March 12 CPS report's use as impeachment evidence was not material because it fails to create a reasonable probability of a different result. The CPS report contains the same information as Investigator Hintz's police report except for the identity of the reporter, which is not material. The CPS report states, "Reporter indicated that no information was given by [S.J.S.] that [Hineman] had touched him or forced [S.J.S.] to touch [Hineman]." The police report states, "No specific information was given on if [Hineman] touched [S.J.S.] or forced [S.J.S.] to touch [Hineman]." The only difference between the two is that the CPS report includes, "by S.J.S." Regardless of this difference, both statements make the same point: At the time Investigator Hintz completed her report, she had no knowledge from any source that there was an allegation of touching. The CPS report provided defense counsel everything she needed to impeach Investigator Hintz's testimony that there was a prior allegation of touching.

¶34 The report also is not material as evidence that a therapist was the mandatory reporter. Hineman argues S.J.S.'s therapist is "a material fact witness," that the patient-provider privilege does not apply because there is no privilege "when the therapist makes a mandatory report . . . under Wis. Stat. § 48.981," and that "[l]ogically, any person trying to ascertain Mr. Hineman's guilt or innocence would want to know

20

more about how, when, and why the reporter suspected Mr. Hineman of this crime."  These arguments are unpersuasive.

¶35 First, Hineman is mistaken that filing a mandatory report waives any privilege from testifying.  He cites Wis. Stat. § 905.04 as support.  However, the only relevant exception to the provider-patient privilege is far narrower than Hineman claims:  "There is no privilege for <u>information contained in a report</u> of child abuse or neglect that is provided under s. 48.981(3)."  § 905.04(4)(e)2m. (emphasis added).  The only way Hineman could have accessed information about S.J.S.'s treatment beyond the CPS reports' contents was to file a <u>Shiffra</u>-<u>Green</u> motion, which, as we discuss below, would fail.

¶36 Second, and more importantly, nowhere in Hineman's argument does he explain how the fact that the mandatory reporter was a therapist creates a reasonable probability of a different result.  He fails to identify any way the mandatory reporter's identity is relevant to the determination of guilt or innocence beyond the vague assertion that the jury might "want to know more."  This does not undermine our confidence in the outcome.  Accordingly, such evidence of the mandatory reporter's identity is not material.

¶37 Because the March 12 CPS report contained no evidence that creates a reasonable probability of a different result, it is not material.  Its suppression therefore did not violate Hineman's due process rights under <u>Brady</u>.

21

B. Ineffective Assistance Of Counsel Claims

¶38 For a criminal defendant to succeed on an ineffective assistance of counsel claim, "[f]irst, the defendant must show that counsel's performance was deficient." Strickland v. Washington, 466 U.S. 668, 687 (1984). "To establish that counsel's performance was deficient, the defendant must show that it fell below 'an objective standard of reasonableness.'" State v. Breitzman, 2017 WI 100, ¶38, 378 Wis. 2d 431, 904 N.W.2d 93 (quoting State v. Thiel, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305). "This court will not second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment." Id., ¶65 (quoting State v. Domke, 2011 WI 95, ¶49, 337 Wis. 2d 268, 805 N.W.2d 364) (alteration in original).

¶39 "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. This is the same test used to determine materiality under Brady. See Bagley, 473 U.S. at 682 ("We find the Strickland formulation . . . for materiality sufficiently flexible to cover . . . cases of prosecutorial failure to disclose evidence favorable to the accused[.]"); Harris, 272 Wis. 2d 80, ¶14 (stating that Brady materiality "is the same test for ineffective assistance of counsel under Strickland"); Wayerski, 385 Wis. 2d 344, ¶36 ("The materiality requirement of Brady is the same as the prejudice prong of the Strickland

22

analysis."). A criminal defendant "must prevail on both parts of the test to be afforded relief." State v. Allen, 2004 WI 106, ¶26, 274 Wis. 2d 568, 682 N.W.2d 433.

¶40 Hineman argues he received ineffective assistance of counsel in four ways: trial counsel failed to request the March 12 CPS report, waived opening statement, failed to object to improper expert testimony, and conceded Hineman's guilt during closing argument. We address each of these claims in turn.

1. Failure to request the CPS report.

¶41 Hineman's first claim of ineffective assistance is based on trial counsel's failure to request the CPS report before trial. This claim fails for lack of prejudice. Because the test for prejudice under Strickland is here the same as the test for materiality under Brady, trial counsel's failure to request the March 12 CPS report was not prejudicial for the same reasons that it was not material.

¶42 Hineman also asserts he was prejudiced because, "had counsel filed motions pre-trial to obtain the CPS report, she likely would have obtained the related April 20 and May 29 CPS reports." However, neither one of these reports creates a reasonable probability of a different result.

¶43 According to Hineman, the April 20 CPS report was "exculpatory" because it "states that [M.S.] and [F.S.] took [S.J.S.] to be examined by a physician for signs of sexual abuse and that 'there [was] nothing from his doctor who examined [S.J.S.] that any type of sexual abuse has taken place.'" However, the nature of the sexual contact the State alleged

23

likely would not produce the kind of evidence that would appear in a physician's examination. Hineman also argues the April 20 CPS report "underscores that it was [S.J.S.'s] behaviors, not Mr. Hineman's, that led to the concern that [S.J.S.] was being abused." Evidence of S.J.S.'s behavioral issues was presented at trial. Trial counsel did not need the April 20 CPS report to support this line of argument.

¶44 The May 29 CPS report's absence also did not prejudice Hineman. He argues the report impeaches S.J.S. because it "suggest[s] that [S.J.S.] was repeatedly questioned about Mr. Hineman and inappropriate sexual touching." But this too came out at trial. M.S. testified that she repeatedly asked S.J.S. to tell her what was wrong, and he was nonresponsive.

¶45 Overall, Hineman was not prejudiced by trial counsel's failure to request the March 12 CPS report because any evidence derived from that request would have been cumulative.[8] Because we resolve this claim on prejudice, we need not address deficient performance.

### 2. Waiving opening statement.

¶46 Hineman next argues that trial counsel was ineffective for choosing to waive opening statement. He argues trial

---

[8] Hineman makes the additional argument that "[h]ad counsel obtained these CPS reports before trial, a defense expert could have rebutted the therapist's assumption that [S.J.S.'s] unusual behaviors meant that he was being sexually abused." Hineman could have called a defense expert even without first reviewing the CPS reports. Officer Hintz's report contains the same information about S.J.S.'s behavior that Hineman alleges raised suspicion that S.J.S. had been sexually assaulted.

counsel performed deficiently because "[f]oregoing an opening statement because you are not sure what your client is going to say——when he has a constitutional right to say nothing at all——is not a reasonable strategy."

¶47 In this case a Machner hearing was conducted. As a result, we benefit from the testimony and circuit court findings. We conclude that this claim fails for lack of deficient performance. Trial counsel explained, "I had some concerns about what he would say when he took the stand. I didn't want to make an opening statement and commit him to something that he wouldn't then say in his direct." The circuit court concluded, "The failure to give an opening statement, when supported by a strategic reason, is largely within the discretion of the trial attorney. I see no reason to disturb this judgement." As a result, trial counsel's strategic decision was reasonable. Courts that have addressed this issue consistently hold that waiving opening statement is an acceptable trial strategy. See, e.g., United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993) (holding that counsel's uncertainty about what his client might say justified waiving opening statement); United States v. Salovitz, 701 F.2d 17, 20-21 (2d Cir. 1983) ("It is common knowledge that defense counsel quite often waive openings as a simple matter of trial strategy.") (collecting cases); Moss v. Hofbauer, 286 F.3d 851, 863 (6th Cir. 2002) (holding that counsel's desire not to disclose trial strategy was a reasonable strategic reason for waiving opening statement).

25

¶48 Trial counsel did not know how or even whether Hineman would testify. It was perfectly reasonable for her to waive her opening statement and avoid making promises to the jury she could not keep. This decision did not fall below "an objective standard of reasonableness." Breitzman, 378 Wis. 2d 431, ¶38. Because we resolve this claim on deficient performance, we need not address prejudice.

3. Failure to object to improper expert testimony.

¶49 Hineman's third ineffective assistance claim also fails for lack of deficient performance. He claims that Jensen presented unnoticed expert testimony on the concepts of "piecemeal disclosure" and "delayed disclosure" and that trial counsel's failure to object to this testimony was deficient performance. Hineman argues this was deficient because trial counsel's proffered strategy of "attacking Jensen's improper expert testimony by trying to establish that this case involved an immediate disclosure——when that testimony could have been kept out altogether——would have undermined the defense strategy and bolstered [S.J.S.'s] incriminating statements."

¶50 However, the testimony and the circuit court's findings at the Machner hearing revealed that trial counsel did not object because she had a reasonable alternative strategy of showing Jensen's testimony did not match the State's theory of immediate disclosure. Trial counsel testified at the Machner hearing, "I just thought that I would on my cross cover [the delayed disclosure testimony] because I didn't think that this was a case of delayed disclosure, if I remember correctly." The

26

circuit court concluded, "The attorney could rely on her experience in examining such experts to have a moment in front of the jury of wrenching an admission out of the witness. That is what the attorney decided to risk and it paid off."

¶51 The record supports that trial counsel pursued this strategy. During cross-examination, she asked Jensen, "And let's say the abuse happens and the child goes and tells the parent immediately. Is that a delayed disclosure?" By pointing out that Jensen discussed delayed disclosure despite the State arguing there was an immediate disclosure, trial counsel highlighted an inconsistency in the State's case. This was consistent with trial counsel's overall strategy. During her closing argument, trial counsel argued the State's witnesses presented varying accounts of when the assault happened, how many times it happened, and when S.J.S. disclosed. We cannot say that trial counsel was deficient for attempting to use otherwise objectionable testimony to her client's advantage. Because we resolve this claim on deficient performance, we need not address prejudice.

4. Conceding guilt during closing argument.

¶52 Hineman's final ineffective assistance claim is that trial counsel conceded Hineman's guilt during closing argument by saying, "But I believe the sexual assault happened." At the Machner hearing, trial counsel explained, "I don't recall conceding Mr. Hineman's guilt[]. . . . [M]y notes say, if it happened, what version do you believe. Then I would go into -- the different things." Though the circuit court found trial

27

counsel was "speaking ironically" to explain the competing versions of events, Hineman argues, "conceding guilt——even in jest——is not a reasonable strategy in a first-degree sexual assault of a child trial."

¶53 Hineman misconstrues the circuit court's finding. The circuit court, who heard the trial and also heard the testimony at the Machner hearing, concluded that counsel's performance was not deficient. Contrary to Hineman's argument, the court did not find that trial counsel conceded guilt "in jest"; it found she did not concede guilt at all. The court explained, "The structure of the closing was designed to contrast the version told in the forensic interview with that coming out at trial. . . . By attempting to force the jury between two different theories, the defense obviously played to doubt." The court found that, in this context, trial counsel's statement was meant only "to criticize the [State's] version of events that had been testified to." Accordingly, the statement was ironic and not a concession of guilt. This is a factual determination to which we owe deference, and it is not clearly erroneous. See Dillard, 358 Wis. 2d 543, ¶86. Because trial counsel never conceded Hineman's guilt, this last claim fails for lack of deficient performance.[9] Because we resolve this claim on deficient performance, we need not address prejudice.

---

[9] The parties disagree as to whether there was a transcription error and the trial transcript should actually say, "But to believe the sexual assault happened." We need not resolve this issue because the circuit court found there was no concession of guilt under the assumption that the transcript was correct.

C.  The Interest Of Justice

¶54 Hineman's final claim is that this court should exercise its discretion to order a new trial in the interest of justice.  Absent other grounds for doing so, this court may order a new trial "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried."  Wis. Stat. § 751.06.

¶55 Hineman asserts the real controversy in this case has not been fully tried because the State improperly presented unnoticed expert testimony and "in camera review of [S.J.S.'s] treatment records is necessary to fully try this controversy."  There are two situations where the real controversy has not been fully tried such that the interest of justice may require a new trial:

> (1) when the jury was erroneously denied the opportunity to hear important evidence bearing on an important issue in the case or (2) when the jury had before it evidence not properly admitted that "so clouded" a crucial issue that it may be fairly said that the real controversy was not tried.

State v. Avery, 2013 WI 13, ¶38 n.18, 345 Wis. 2d 407, 826 N.W.2d 60.  "However, such discretionary reversal power is exercised only in 'exceptional cases.'"  Id., ¶38 (quoting State v. Henley, 2010 WI 97, ¶98, 328 Wis. 2d 544, 787 N.W.2d 350).  "We are reluctant to grant a new trial in the interest of justice, and thus we exercise our discretion only in exceptional cases."  Morden v. Cont'l AG, 2000 WI 51, ¶87, 235 Wis. 2d 235, 611 N.W.2d 659.

29

¶56 Hineman's first argument regarding unnoticed expert testimony fails. His assertion that Jensen's testimony on the concepts of "piecemeal disclosure" and "delayed disclosure" requires a new trial merely repackages his ineffective assistance claim, which we already rejected, as an interest-of-justice claim. As for Investigator Hintz's testimony on the concept of "grooming," it consisted entirely of the following statement: "Those things, in the totality of everything that he was doing is often described as what we would refer to as grooming." Trial counsel immediately objected to this testimony, and the court sustained that objection. Neither Jensen's nor Investigator Hintz's testimony on these topics was so inflammatory or pervasive that it clouded the real issue at trial: whether Hineman had sexual contact with S.J.S.

¶57 Hineman's second argument also fails because he has not made the requisite evidentiary showing necessary to obtain in camera review of S.J.S.'s treatment records. In order to gain in camera review of treatment records, a defendant must "make a sufficient evidentiary showing that is not based on mere speculation or conjecture as to what information is in the records." Green, 253 Wis. 2d 356, ¶33. "[T]he evidence sought from the records must not be merely cumulative to evidence already available to the defendant. A defendant must show more than a mere possibility that the records will contain evidence that may be helpful or useful to the defense." Id. Because we conclude the absence of the CPS reports did not prejudice Hineman, it follows that the reports do not form an adequate

30

evidentiary basis supporting in camera review of S.J.S.'s treatment records, and the jury was not "erroneously denied the opportunity to hear important evidence."[10]    Avery, 345 Wis. 2d 407, ¶38 n.18.

¶58 The real issue was fully tried.    Hineman's disagreements on whether the jury should or should not have heard certain evidence does not change that fact.    We therefore deny Hineman's plea for a new trial in the interest of justice.

IV. CONCLUSION

¶59 Hineman argues that he is entitled to a new trial because the State suppressed evidence favorable to his defense in violation of his due process rights under Brady.    According to Hineman, the State failed to disclose a report from CPS which contained "material exculpatory impeachment evidence that went to an issue at the heart of the case."    He argues the circuit court erred in denying his motion for postconviction relief and that the court of appeals was correct to reverse that decision. Hineman also argues two alternative grounds for affirming the court of appeals: "he was denied effective assistance of counsel," and he "is entitled to a new trial[] and an in camera

---

[10] We heard argument earlier this term in State v. Johnson, No. 2019AP664-CR, regarding whether "the court [should] overrule State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993)." State v. Johnson, No. 2019AP664-CR, unpublished order, at 2 (Wis. Oct. 14, 2021).    That case remains pending. Regardless of how we resolve the issue in Johnson, we conclude that Hineman cannot make the evidentiary showing necessary for review under the Green standard.

31

review of [S.J.S.'s] treatment records[] in the interests of justice."

¶60 We conclude that Hineman is not entitled to postconviction relief. The State did not violate Hineman's due process rights by failing to disclose the CPS report because the report was not material. There is no reasonable probability of a different result if the State did disclose the CPS report because Hineman had access to a police report containing the same relevant information. Hineman's four ineffective assistance of counsel claims also fail. He was not prejudiced by trial counsel's failure to request the subject report, and the other claims fail because counsel's performance was not deficient. Finally, we decline to exercise our discretion to grant Hineman a new trial in the interest of justice because there were no errors at trial that prevented the real controversy from being tried. The circuit court was correct to deny Hineman's motion for postconviction relief. We therefore reverse the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶61 JILL J. KAROFSKY, J. *(concurring)*. I write separately to push back against a pernicious myth about child sexual assault victims found in the court of appeals opinion. The court of appeals determined that the child victim in this case presented credibility issues, in part because he did not disclose to his therapist that he was a victim of Hineman's sexual abuse. See State v. Hineman, No. 2020AP226-CR, unpublished slip op. (Wis. Ct. App. Nov. 24, 2021) (per curiam). Such reasoning ignores the barriers child sexual assault victims face in reporting sexual abuse and perpetuates the misguided notion that delayed disclosures in these cases are the exception rather than the norm.

¶62 To bolster its conclusion that "[t]he state's case was not particularly strong," the court of appeals faulted S.J.S. for not disclosing his abuse to his therapist. The court wrote, "[S.J.S.] meeting with his therapist around this time would have provided an obvious opportunity for S.J.S. to reveal if he had been inappropriately touched by Hineman, yet S.J.S. made no such revelations." Id. at ¶41 (emphasis added). Assertions such as this ignore the victim's herculean task of reporting sexual abuse.

¶63 There are myriad reasons children do not report sexual abuse——to anyone. These include: an inability to recognize or articulate sexual abuse, an uncertainty about which adults are safe, a lack of opportunities to disclose, fear of not being believed, trauma that results from the abuse, power differentials between the child victim and adult perpetrator,

1

and institutional power dynamics. CHILD USA, Delayed Disclosure: A Factsheet Based on Cutting-Edge Research on Child Sex Abuse, 2 (Mar. 2020). Additionally, recounting abuse, particularly for child sexual abuse survivors, "creates new painful and traumatic memories that compound older pain associated with the abuse. Recounting the abuse experience, especially more than once, 'triggers' survivors and can leave them feeling exhausted, fatigued, and defeated." James Marsh & Margaret Mabie, Trauma-Informed Advocacy, Trial, Aug. 2022, at 38 (footnotes omitted).

¶64 Importantly, when disclosure does occur, it does not usually happen in one sitting. Rather, disclosure is a process that can take decades and may involve "telling through direct and indirect hints and signs, decisions to tell, re-decisions and delaying, or withholding until adulthood, and the dependency on trusted confidants who ask and listen for final disclosure to occur." CHILD USA at 2 (quoting Maria Larsen Brattfjell & Anna Margrete Flam, "They Were the Ones That Saw Me and Listened." From Child Sexual Abuse to Disclosure: Adults' Recalls of the Process Towards Final Disclosure, 89 Child Abuse Neglect 225 (2019)).

¶65 The truth——as opposed to the myth——is that when it comes to child sexual assault cases, disclosure is the departure from the norm. According to data from the U.S. Department of Justice as much as 86 percent of child sexual abuse may go unreported altogether. Dean G. Kilpatrick et al., U.S. Dep't Just., Youth Victimization: Prevalence and Implications, 6 (Apr.

2003).  And when disclosure of child sexual abuse does occur, it is almost always delayed.  Strikingly, the average age of disclosing childhood sexual abuse is 52.  CHILD USA at 3.

¶66  In short, there was never an "obvious opportunity" for S.J.S. to disclose to his therapist or anyone else.  There were only barriers and trauma and uncertainty.  In the face of these obstacles, what should cause us to pause is not that S.J.S. failed to disclose to his therapist but that he had the courage to disclose at all.

¶67  I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this concurrence.

3